# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **MITNICK LAW OFFICE, LLC**<br>　　　　　Petitioner,<br><br>v.<br><br>**BALANCED BRIDGE FUNDING LLC**<br>　　　　**Respondent.**<br><br>_____<br><br>**BALANCED BRIDGE FUNDING LLC**<br>　　　　**Petitioner**,<br><br>**v.**<br><br>**MITNICK LAW OFFICE, LLC**<br>　　　　**Respondent.** | **Civil Action No. 2021-mc-00075-PBT**<br><br><br><br><br><br>**Civil Action No. 2021-cv-04073-PBT** |

## PETITIONER, MITNICK LAW OFFICE'S PRE-TRIAL MEMORANDUM

Mitnick Law Office, LLC submits this Pre-Trial Memorandum in preparation of the consolidated trials in the above captioned matters which involve opposing motions filed by the Parties. Petitioner's Pre-Trial memorandum will address Balanced Bridge Funding LLC's application to certify and enforce the arbitration award issued in its' favor, as well as Mitnick Law Office's application to Vacate the arbitration award given Balanced Bridge's unfair advantage in the arbitration, given the improper representation by Fox Rothchild given a clear conflict of interest. That inherent conflict of interest required that Fox Rothchild recuse themselves from the arbitration, however both Balanced Bridge and the Fox attorneys choose to

pursue the adverse action against Mitnick Law Office, even in defiance of the Rules of

Professional Standards. That decision , undoubtedly driven by money now requires the Court to

Vacate the unjust award given the alleged unscrupulous behavior.

## Statement of Facts

The Arbitration in this matter concerns the unjust and unfair award in favor of Balanced that was

prejudiced from day one due to the unprincipled and improper manner in which it was litigated.

Balanced Bridge Funding (Balanced) had an unfair advantage over Mitnick Law Office

(Mitnick) in that the law firm and attorney, Eric Reed who represented the funding company was

in possession of privileged information and privileged documentation that was acquired from the

firm's representation of Mitnick for the six years prior to the arbitration, and the law firm's

decision to involve themselves in adverse litigation against Mitnick, a former client, in the same

underlying matter for which they represented Mitnick in.

By way of background, Balanced sold Mitnick *unending*, *high-rate* indebtedness when it never

intended on providing anything close to risk-free funding. While Mitnick was in a financially

vulnerable state, Balanced preyed upon Mitnick's trust and unfamiliarity with the funding

product and presented a series of  Agreements for Mitnick's signature that were vague and

confusing at best, and deliberately deceitful at worst.

Mitnick is the sole owner and member of the Mitnick Law Office. In early December 2011,

Mitnick spoke with numerous former National Football League ("NFL") players about the

possibility of a large concussion-related mass tort action that was being explored. By 2012

Mitnick directly represented over 250 retired NFL players who were suing the League for the

concussion related injuries. In addition to his direct representation of those 250 players, Mitnick

referred another 1000 players to Lock's Law Firm rather than handling the cases directly, given Mitnick's restricted resources in staffing.

From early 2012 until a Settlement Agreement with the NFL received final approval and until recently, Mitnick worked full time on the matter.

In the summer of 2015, Joseph Genevesi ("Genevesi") contacted Mitnick as a result of Mitnick's high-profile involvement in the Litigation. Up until that time, Mitnick had no familiarity with, knowledge of, or need for "Litigation Funding". He had been contacted by numerous funding entities previously and never had more than a single conversation with any of the solicitors. However, Genevesi sparked his interest given the "no-risk" sales pitch he sold to Mitnick.

Over the course of several weeks' worth of phone calls, emails, and meetings, Genevesi explained that he was interested in getting Mitnick as a client so that his newly established funding company could provide funding to as many plaintiffs in the NFL Litigation as possible.

It just so happened that, in about 2015, after working full time on the litigation for three years, Mitnick was in a financially vulnerable state. Having been involved with the NFL Litigation for over 40 months, Mitnick's well had virtually run dry.

Genevesi gave Mitnick a "hard" sell about the potential funding. He insisted that there was absolutely no risk to Mitnick or Mitnick Law, as the transactions were "non- recourse". This meant that, if the Settlement did not materialize, or the case did not pay out as expected, neither Mitnick nor his Office would be liable.

Mitnick has since found these representations to be in accord with the written statements published on Balance's website, which touts, inter alia, "Relax, We Accept All the Risk: Balanced Bridge Funding accepts all risk of non-payment, if for some reason the defendant/obligor is unable to pay the settlement, you will still keep the money from your advance".

The funding company's website also states that "*attorney post-settlement litigation funding is non-recourse. This means that if for some reason the obligor is unable to pay the agreed upon settlement amount, preventing the payment of attorney's fees, that attorney would still keep any portion of the fee that was advanced under a legal funding agreement*".

Genevesi advised Mitnick on numerous occasions that the "non-recourse agreements" meant that it was his firm (Balanced) that was running the risk, which is why some of the transactional costs appeared higher than might otherwise be expected.

Mitnick signed the first Agreement with (then) Thrivest (now Balanced) on September 23, 2015 ("First Agreement"). This was the first of nine (9) separate Agreements between the Parties, with the final one being entered into on April 25, 2018 (collectively, "the Agreements")(Id.).

Because the Agreements were represented to be "non-recourse," the concerns Mitnick had about repayment were allayed by Genevesi's repeated oral assurances (Id. at ¶40). He explained that the chart at the back of the Agreements (Schedules of Payment) reflected the amounts that the Respondent would owe on various dates, however they were for informational purposes only. Mitnick thus understood that the repayment was risk-free to the Respondent because it was

premised upon receipt of the expected Settlement fees—and if they did not come through, there was "no recourse" for Balanced and no liability on behalf of Mitnick.

Over the course of the nine Agreements, Mitnick borrowed the total principal amount of $2.3 Million Dollars. Mitnick repaid Balanced approximately $1.9 Million Dollars by late 2019 at which time the Parties ended up in a dispute. After Mitnick's contingent fees, along with all other attorneys involved in the litigation were reduced almost in half by the Court, and Mitnick's expected five to ten million in Common Benefit fees were reduced to less than one million, Mitnick was advised by Genevesi that the risk was all on Mitnick and Balanced did not legally need to incur any of the risk, and that Mitnick would be responsible for all fees over the course of the 65 year settlement, or until all principle and "business" fees were paid in full. Mitnick was advised that the small print in the Agreements held him responsible for "interest" on the "Purchase-Sale Agreements" at a 19% rate that compounded monthly and accrued daily.

As it turned out, the Office's obligations under the Agreements were impossible to meet given the limited Common Benefit Monies it received; the slow financial rate at which the claims were settling; the 5% holdback that the Claim Administrator withheld from each award (ordered by the Court); and the reduced contingent fees allowed. Interest that the Claimant included in the Agreements is and has been accruing at a higher rate than at which the lawsuits are settling yet the arbitrator ruled that Balanced was not responsible for any of that liability or risk as Mitnick had been guaranteed by Genevesi.

Balanced exercised their right under the agreement to arbitrate against Mitnick alleging a breach of contract. The arbitration took place over the course of a year, however there were only a handful of appearances and arguments prior to the arbitrator's final award in favor of Balanced.

Procedurally, prior to any substantive issues being litigated, Mitnick made an application to the arbitrator to disqualify Fox Rothschild due to the inherent conflict of interest. The arbitrator reviewed written submissions from both parties and very brief oral argument before making a decision to allow Fox Rothschild to remain in the arbitration, however the decision was made without prejudice.

Given that <u>no</u> appeal may be taken during the course of an arbitration and must take place subsequent to the final award being issued, Mitnick was forced to move forward with the arbitration and only after the award was issued, did Mitnick have the ability to file a formal application requesting that the award be vacated due to the unfair advantage of balanced by its representation by Fox Rothschild.

Given the fact that the arbitrator had no prior knowledge of the facts of the matter when he entered the arbitration, it was literally impossible for him to know what would be forthcoming in discovery and argument. This fact in concert with attorney Eric Reed's representations to the arbitrator that "*the arbitration concerned a completely separate issue than what the firm representing Mitnick and that Mitnick had created a conflict as an allusion to delay litigation*". At the conclusion of the arbitration, it was clear that not only were many of the facts presented by Balanced the same ones that were dealt with in Mitnick's representation by Fox, however the NFL client case listings that were the subject of the arbitration and the basis of the award were the same case listings that Fox secured for Mitnick.

**The Conflict of Interest**

Shortly after Mitnick became involved in the litigation, on October 26, 2012, he retained the law firm of Fox Rothchild LLP (Philadelphia) to represent both the interests his law firm, Mitnick

Law Office LLC, as well as his personal interests in regard to eventual legal fees and personal involvement in the matter. Given Mitnick's limited experience in the mass tort specialty field, upon advice of a colleague and out of abundance of caution, Mitnick decided to retain counsel for the protection of the firm's future fees, as well as to provide him personally with professional guidance throughout the NFL matter, when and if issues were to arise.

Mitnick signed a formal Retainer Agreement with the law firm of Fox Rothchild, LP in Philadelphia on October 26, 2012. The Retainer Agreement initially stated that the Retainer Agreement covered "consultation and ongoing advice regarding the referral arrangement between me and Gene locks from Lock's Law Firm in regard to the National Football Player Concussion Injury Litigation".

Even though the Retainer Agreement specifically referenced the dealings with Locks Law Firm, the six-and-one-half year actual representation of Mitnick by Fox Rothschild included more expansive areas, such as outside matters relating to Retired Player Kevin Turner and the Estate of Kevin Turner, advice and guidance regarding entitlement to Common Benefit fees, funding opportunities and funding risks alike.

Given Mitnick's extensive involvement in the NFL matter, several years later, in October of 2015 as previously mentioned, he entered into the first of a series of nine litigation funding Agreements with a funding entity known as Thrivest. Over the course of several years, Mitnick borrowed a total of $2.3 million dollars. At some point in 2019, Mitnick formally learned that in October of 2017, two years earlier, Fox Rothchild had also entered into a Retainer Agreement with Balanced  covering NFL litigation concussion related matters.  At all times, the funding

company was well aware that Fox Rothchild had been retained to represent Mitnick and Fox

Rothchild was well aware that Balanced was the funding entity that Mitnick had a contractual

relationship and had secured litigation funding from.

Two years after Fox began collecting legal fees from both Mitnick and Balanced, in late 2019, a

dispute arose between Mitnick and Balanced. Fox Rothchild took a position adverse to Mitnick

and in favor of Balanced. Fox Rothchild filed an arbitration demand against Mitnick and

aggressively pursued the arbitration against the firm; the same firm that they had represented for

6 ½ years immediately prior to the action.

Given The decision to become and remain averse to Mitnick, the follow violations of the

Pennsylvania Rules of Professional Conduct were violated:

RPC 1.1 (Competence)

RPC 1.3 (Diligence)

RPC 1.4 (Truthfulness in communications)

RPC 1.7 (Concurrent conflicts)

RPC 1.8 (Conflict)

RPC 1.9 (Duty to former clients)

RPC 1.10 (Imputation of Conflicts of Interest)

RPC 8.4(d) (Prejudicial to the Administration of Justice)

RPC 8.4(c) (Fraud)

Mitnick was kept in the dark regarding Fox Rothchild's representation on behalf of Balanced.

Mitnick was never provided with a copy of the Balanced retention agreement, nor was Mitnick

ever consulted or advised that Fox-Rothchild had intended to enter into the relationship, or that

they had actually entered into the relationship with Balanced.  Mitnick received nothing from Fox

regarding the retention with Balanced even though Mitnick had been an active client of Fox for the

six years preceding the onset of Fox's relationship with Balanced and after which time Fox had

become privy to confidential conversations that were attorney-client privileged, and Fox had become

privy to hundreds of pages of documentation regarding Mitnick's retired player clients. This

documentation included the 1000+ Locks/Mitnick case listings that was the main subject of the

arbitration damages hearing. Additionally, Fox Rothchild had no familiarity with the NFL litigation

prior to being retained by Mitnick and prior to being educated by Mitnick in regard to multiple facets

of the litigation itself. Fox had also developed deep insight into Mitnick's relationship with lead

counsel; Mitnick's relationships with specific retired players; common benefit monies specific to the

litigation, as well as a deep understanding of the intimate details of the 1000 cases Mitnick had

referred to Locks, including numerous cases that Balanced had not yet been advised of.  All of these

confidential communications and documentation played a large role in the ultimate arbitration

decision.


At the onset of the arbitration proceedings, Mitnick advised the arbitrator of a possible conflict,

however the arbitrator (nor any individual without an intimate understanding of the totality of the

underlying facts) could have properly determined whether a true conflict existed or not. That decision

could only have been determined fairly  after the fact finder had a complete understanding of the

issues, the discovery, counsel's arguments, and written briefings.

Going back to November of 2019, Mitnick received adverse correspondence from Peter Buckley, Esquire, one of the primary attorneys from Fox Rothchild who had represented Mitnick and Balanced simultaneously. The November 2019 email correspondence from attorney Buckley stated that Fox Rothchild represented Balanced regarding the litigation funding Agreements in which Mitnick had previously entered into with Balanced. The correspondence received by Mitnick from Attorney Buckley demanded documentation in regard to the funding and the individual case lists Mitnick possessed and that were used as evidence in the arbitration by Fox on behalf of Balanced.

Almost immediately after receiving the demand letter, Mitnick responded to Attorney Buckley, advising that there was obviously a clear ethical conflict and a clear violation of the Rules of Professional Conduct given the dual representation. The email to Buckley from Mitnick advised that the representation adverse to Mitnick was ethically inappropriate. Buckley continued representing Balanced

On April 29, 2020, Mitnick received further adverse correspondence from Fox Rothchild attorney Eric Reed who worked very closely with attorney Peter Buckley. The adverse correspondence from Reed to Mitnick referred to the November correspondence from Buckley, as well as confirmed numerous phone calls placed to Mitnick from Buckley that were adversarial to Mitnick and favorable to Balanced.

Again, out of courtesy Mitnick provided notice to Eric Reed, esq. and others at Fox Rothchild of his opposition, position, and strong belief that there was an inherent ethical conflict that precluded Buckley, Reed, or any other attorney at Fox Rothchild from continuing their aggressive adverse action against Mitnick.

The questionable practice by Attorney Reed continued when he in fact advised the arbitrator that the conflict argument was illusory and just a delay tactic created by Mitnick. Further, Reed stated to the arbitrator that the conflict alleged by Mitnick was inconsequential and fabricated.  Shortly thereafter, during a pre-scheduled telephone conference with the Arbitrator that was not recorded, or documented on any record, the Arbitrator stated, "No matter how he decided on the conflict issue, that either Fox Rothchild or another firm would represent Balanced in the arbitration, so we should all just move forward".

The unfair advantage that Balanced received through Fox's prior multi-year representation of Mitnick created an unfair playing field and put Mitnick at a complete disadvantage in the arbitration.

**Legal Authority**

Rule 1.9 of the New Jersey, Pennsylvania, and American Bar Association Rules of Professional Conduct state that:

(a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are

materially averse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

(b) A lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client

(1) whose interests are materially averse to that person; and

(2) about whom the lawyer had acquired information protected by Rules 1.6 and 1.9 (c) that is material to the matter; unless the former client gives informed consent, confirmed in writing.

(c) A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:

(1) use information relating to the representation to the disadvantage of the former client except as these Rules would permit or require with respect to a client, or when the information has become generally known; or

(2) reveal information relating to the representation except as these Rules would permit or require with respect to a client.

Rule 1.10 of the New Jersey, Pennsylvania and American Bar Association Rules Professional Conduct provides:

(a) When lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by RPC 1.7 or RPC 1.9,

unless the prohibition is based on a personal interest of the prohibited lawyer and does not present a significant risk of materially limiting the representation of the client by the remaining lawyers in the firm.

The New Jersey Supreme Court has held that for purposes of RPC 1.9, matters are substantially related " if *(1) the lawyer for whom disqualification is sought received confidential information from a former client that can be used against a client in a subsequent representation of parties adverse to the former client; or (2) facts relevant to the prior representation are relevant and material to the subsequent representation*."

In the Fox Rothchild matter, both of the above provisions apply. First, Fox Rothchild did in fact receive confidential information from MLO that could be used in Balanced Bridge's action adverse to MLO. Not only was Fox Rothchild provided with information from Craig Mitnick, Esquire pertaining to the terms of the transactions between MLO and Balanced Bridge, but that information contained confidential communications pertaining to how MLO viewed the terms of the Agreements (whether true buy-sell transaction or banking transaction, and whether the terms were legal or not) which could dramatically change the transaction amounts if there was ever a dispute. Additionally, Fox Rothchild was provided with and had access to MLO's NFL client lists, some of the clients who may not have been provided to Balanced Bridge initially. Further, another substantial client listing was provided to Fox Rothchild directly by a partner at Lock's law firm, Michael Leh that was not provided to Balanced Bridge due to the fact that it was an ongoing work product between MLO and Locks Law Firm. The clients included on this list may in fact go to the core of the dispute between MLO and Balanced Bridge as Balance Bridge is asserting that MLO did not turn over all fees received from their retired player clients and did not

make appropriate disclosures regarding clients. Just as importantly, these lists are relevant and material to the representation of Balanced Bridge by Fox Rothchild and to the dispute between MLO and Balanced Bridge, explicitly creating an ethical conflict given Fox Rothchild's representation of Balanced Bridge in the dispute.

The New Jersey Supreme Court's opinion in City of Atlantic City v. Trupos, 201 N.J. 447, 992 A.2d 762 (2010), the Supreme Court stated that for purposes of RPC 1.9, matters are substantially related "if (1) the lawyer for whom disqualification is sought received confidential information from a former client that can be used against a client in a subsequent representation of parties adverse to the former client; or (2) facts relevant to the prior representation are relevant and material to the subsequent representation". Again, endorsing the language in Rule 1.9.

Fox Rothchild had access to a pleura of NFL Litigation information from MLO given MLO's extensive involvement, including confidential agreements between MLO and Lead Counsel, litigation documents and work product, summaries of numerous discussions between Craig Mitnick, Esquire and Christopher Seeger, Esquire, lead counsel, as well as, confidential and non-confidential client listings, confidential communications with Gene Locks and Michael Leh, both partners at Locks Law Firm, in addition to other sensitive information that could come into play in the dispute between MLO and Balanced Bridge and was known only to MLO.

Further, as noted in Ms. Brigham's May 5, 2020 reply to Mitnick, Brigham explicitly stated: *"to our understanding, you (Mitnick) did not receive any fees from the NFL Concussion Class Action — or that are at issue under the June 7, 2017 and April 26, 2018 agreements—at any time before the Firm's representation of you concluded. Indeed, considering that the Firm's representation of you ended in May 2018, we are confident that Thrivest's current dispute with you does not*

*concern fees received by you during our representation of you*". If fact no fees were actually received prior to the Summer of 2018 by MLO and Fox Rothchild's formal representation of MLO did not end until February of 2019 (See conclusion of representation letter under date of February 21, 2019 attached as Exhibit G). Even under the incorrect assumption that representation ended in May of 2018, legal fees due to MLO on cases that had received awards prior to May of 2018 were already allocated (not dispersed) and notice of the award amounts and respective attorney fees had been provided to MLO. These awards, how they were determined, and the amounts were discussed with Peter Buckley, and they are at the core of current dispute. Ms. Brigham's argument fails.

In addition to the ethical conflict that Fox Rothchild was advised on by Mitnick back in November 2019, The American Bar Association's Comments to Rule 1.9 unequivocally state that "After termination of a client-lawyer relationship, a lawyer has certain continuing duties with respect to confidentiality and conflicts of interest and thus may not represent another client except in conformity with this Rule...Nor could a lawyer who has represented multiple clients in a matter represent one of the clients against the others in the same or a substantially related matter after a dispute arose among the clients in that matter, unless all affected clients give informed consent. See Comment [9]. Even though Fox Rothchild's contention is that they "*take the rules of professional responsibility very seriously*", they represented two independent clients at the same time with regard to the NFL Concussion Litigation and then ended representation of one client, furthered the relationship with the other and then went after the former client. Members of the Fox Rothchild firm, on behalf of MLO, reviewed Settlement documents, attended Court hearings, became privy to confidential communications, and obtained knowledge and insight from those confidential communications. The firm then used this information and

insight into the litigation to assist Balanced Bridge with their involvement in the same litigation. Why would they now do anything different?

Within months of ending their relationship with MLO, Fox Rothchild then began an adversarial attack on MLO, their "former client". This behavior alone causes a collapse in the public's perception of the ethical makeup of attorneys. Even though Fox Rothchild represented both MLO and Balanced Bridge with regard to the same legal matter at the same time, the firm now attempts to argue that the matters that they were representing MLO on and the matters that they were representing Balanced Bridge on were completely different and unrelated. The underlying matter (the NFL Concussion litigation) was the core matter and the facts pertaining to each representation were very similar. The only difference is that the firm's involvement with MLO's representation was undoubtedly beneficial to their representation of Balanced Bridge. Fox Rothchild has and will continue to argue that their representation of each client was different. How could this logic prevail when the representation of MLO focused on fees and protection of fees from the NFL matter and the focus of the firm's representation for Balanced Bridge was and is the same.

Looking to Comment 3 of the American Bar Association comments to Rule 1.9, the commentary is as clear with regard to the issue of "substantially related".

Matters are "substantially related" for purposes of this Rule if they involve the same transaction or legal dispute or if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter... Information that has been disclosed to the public or to other parties adverse to the former client ordinarily will not be disqualifying. In Information

acquired in a prior representation may have been rendered obsolete by the passage of time, a circumstance that may be relevant in determining whether two representations are substantially related. In the case of an organizational client, general knowledge of the client's policies and practices ordinarily will not preclude a subsequent representation; *on the other hand, knowledge of specific facts gained in a prior representation that are relevant to the matter in question ordinarily will preclude such a representation. A former client is not required to reveal the confidential information learned by the lawyer in order to establish a substantial risk that the lawyer has confidential information to use in the subsequent matter. A conclusion about the possession of such information may be based on the nature of the services the lawyer provided the former client and information that would in ordinary practice be learned by a lawyer providing such services.*

Even in Pennsylvania, the District Court for the Eastern District of Pennsylvania has held that matters are "substantially related for purposes of RPC 1.9 if they involve the same transaction or legal dispute, or if there otherwise is a risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter." United States v. Fumo, 504 F. Supp. 2d 6, 28 (E.D. P.A. 2007). There is no doubt that in the dispute between Balanced Bridge and MLO most of the information acquired from MLO and in possession of Fox Rothchild could or has already materially advanced Balanced Bridge's position over MLO in their dispute.

Moreover, In Rohm & Haas Co. v. American Cyanamid Co., 187 F. Supp. 2d 221, 228 (D.N.J. 2001), the New Jersey federal court interpretation that "matters are considered substantially

related" when it can reasonably be said that in the course of the former representation an attorney might have acquired information related to the subject matter of his or her subsequent representation." In this more liberal interpretation, the only condition necessary for disqualification is that the attorney/s involved in the former representation might have acquired information that could be relevant in a subsequent adversarial matter to the former client.

According to the ABA, RPC 1.9 (a) should be read in conjunction with RPC 1.10(a), which states that "[w]hen lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by RPC 1.7, RPC 1.8, RPC 1.9 or RPC 2.2." Once Mr. Buckley refused to acknowledge that any conflict existed and then without notice to MLO sent a letter on behalf of Balanced Bridge that was adversarial to MLO, he was immediately in a conflict situation. He should never had agreed to represent Balanced Bridge against MLO in the first place. Then after MLO gained knowledge of the adverse representation though receipt of the November 18, 2019 correspondence from Buckley and advised Buckley that he was in a conflict situation, Buckley had the opportunity to cure the wrong, however he refused and ignored the conflict. Then, out of the blue, Eric Reed became the primary attorney handling the Balanced Bridge/MLO matter. Similarly, as Buckley did, after Reed was advised of the conflict by Mitnick he not only ignored the conflict, if proceeded to file an arbitration against MLO and then argued to the American Arbitration Association that no conflict existed, and that the idea of a conflict was a delay tactic by Mitnick. Buckley and Reed have work alongside one another and in conjunction with one another on Balanced Bridge representation for quite some time. This is evident by pleadings with the Third Circuit Court of Appeals and the Federal District Court that bear both of their names.

RPC 1.10(a) explicitly *reads "[w]hen lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by RPC 1.7, RPC 1.8, RPC 1.9 or RPC 2.2".* Fox Rothchild's continued representation of Balanced Bridge is not only iniquitous, but also ethically improper. Fox Rothchild is clearly placing firm profits before ethics, and they must be disqualified from representing Balanced Bridge in any capacity.

Additional focus should be placed on material adversity, the relationship between the current and the past matters, and informed consent. In this case there is without question material adversity and an undeniably clear relationship between the facts. Further, there was absolutely NO notice by Fox Rothchild to MLO of the Balanced Bridge representation nor was there the required informed consent by MLO to the representation. All of these factors indubitably give rise to the ethical violations. The only conclusion that can be drawn is that Fox Rothchild was involved in "side switching" by furthering representation on behalf of Balanced Bridge by keeping them as a client and discarding any duty they had to MLO.

Although motions to disqualify a party's counsel are generally viewed with disfavor and parties seeking to disqualify opposing counsel carry "a heavy burden and must satisfy a high standard of proof," any "doubts are to be resolved in favor of disqualification." Essex Chem. Corp. v. Hartford Accident & Indem. Co., 993 F. Supp. 241, 246 (D.N.J. 1998) (citations omitted). Further, Courts must also consider their "obligation to preserve high professional standards and the integrity of the proceedings." Id. (citations omitted).

It is indisputable that there was and continues to be an inherent conflict of interest in Fox Rothchild's representation of Balanced Bridge. Fox Rothchild has been privy to information,

some of which is confidential that will undoubtedly create, if it has not already, an unlevel playing field that unfairly gives Balanced Bridge an advantage over MLO. Fox Rothchild should be disqualified from representing Balanced Bridge due to ethical and conflict violations. The rationale for disqualification here is compelling and there remains a strong need to maintain high standards of client confidentiality and ethics.

## Nature of the Action and jurisdictional basis:

This is an action under the Federal Arbitration Act, 9 U.S.C. § 1, et seq. ("FAA") to confirm an arbitration award in favor of Balanced and against Mitnick ("Mitnick Law"). Subject-matter jurisdiction is based on diversity, as Balanced Bridge is a citizen of Pennsylvania and Mitnick Law is a citizen of New Jersey.

## Witnesses:

The scope of the witnesses that Mitnick will present at trial will depend, as in the case of Balanced, on the scope of the trial anticipated by the Court. In any event, Mitnick will include the following witnesses on its' witness listing.

a. Joseph R. Genovesi

b. Peter Buckley, Esquire

d. Barbara Brigham, Esquire

e. Fern Mitnick, Esquire

f. Michael Leh, Esquire,  Locks Law Firm

## Exhibits:

The scope of the exhibits that Mitnick will rely upon include the exhibits that Balanced has already identified in their Pre-Trial memorandum, as well as the client file produced by Fox to Mitnick and Mitnick's client listings.

## Days for Trial:

Mitnick should be able to present his witnesses and exhibits in one day of trial. The Court has reserved two days, July 13 and 14, 2022 for a trial.

## Special Comments:

Mitnick, as does Balanced, respectfully requests that the Court hold a Pre-Trial conference in order to understand the parameters of trial testimony. It is Mitnick's position that the Court entertain all relevant evidence and testimony presented in order to ascertain whether the application to Vacate the award is justified. It is the further position of Mitnick that the scope of evidence required to ascertain a fair and just result should in no way be restricted to the question of whether or not the arbitration satisfied the FAA's requirements. That restricted position could be appropriate if this was solely a Motion to Enforce, however given the fact that the Motion to Vacate is also being decided warrants enhanced testimony and evidence to ensure a correct outcome and fairness to both Parties.

Further, Mitnick disagrees with Balance's argument that the trial must be Summary and that the Court "must" grant Balance's timely request for confirmation of the arbitration award. The Court

has complete authority to vacate the award if after considering all of the evidence it finds that the

Motion to disqualify Fox from representing Balance was heard in a summary or premature

fashion and was legally incorrect. Further, Mitnick's position is that FAA, 9 U.S.C. §10(a),

expressly limits the power of a reviewing court to vacate or modify an arbitration award to the

following circumstances: (1) where the award was procured by corruption, fraud, or undue

means; (2) where the arbitrator was guilty of misconduct in refusing to postpone the hearing,

upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the

controversy; or of any other misbehavior by which the rights of any party have been prejudiced;

or (3) where the arbitrators exceeded their powers, or so imperfectly executed them that a

mutual, final, and definite award upon the subject matter submitted was not made.

The Third Circuit also recognizes a fifth ground for vacatur in "exceptional cases" where there is

a demonstrable "manifest disregard of the law." Popkave v. John Hankcock Distrib., LLC, 768

F.Supp.2d 785, 789 (E.D. Pa. 2011).

Respectfully submitted,

/s/ Craig R. Mitnick

Craig R. Mitnick, Esquire
MITNICK LAW OFFICE LLC
8000 Sagemore Drive, Suite 8305
Marlton, New Jersey 08053
856-427-9000
craig@mitnicklegal.com
Attorney for Mitnick law Office LLC
Attorney ID: 50728

**CERTIFICATE OF SERVICE**

The undersigned certifies that, on June 13, 2022, he filed the foregoing with the Court using the ECF system, which will provide notice and a copy to counsel of record.

/s/ Craig R. Mitnick

**CERTIFICATE OF SERVICE**

The undersigned certifies that, on June 13, 2022, he filed the foregoing with the Court using the ECF system, which will provide notice and a copy to counsel of record.

/s/ Craig R. Mitnick